**RECORD NO. 13-2212**

*In The*

# United States Court Of Appeals
## For The Fourth Circuit

## CHRISTINA LYNN JACOBS,

*Plaintiff – Appellant,*

**v.**

## N.C. ADMINISTRATIVE OFFICE OF THE COURTS; JAN KENNEDY, in her official capacity as New Hanover County Clerk of Superior Court,

*Defendants – Appellees,*

and

**BRENDA TUCKER, New Hanover County Clerk of Superior Court; MELISSA GRIFFIN; DEBRA EXCELL,**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT WILMINGTON**

––––––––––––––––––

## BRIEF OF APPELLANT

––––––––––––––––––

Vanessa K. Lucas
EDELSTEIN & PAYNE
Post Office Box 28186
Raleigh, NC 27611
(919) 828-1456

Lisa Grafstein
Mercedes Restucha-Klem
DISABILITY RIGHTS
 NORTH CAROLINA
2626 Glenwood Avenue
Suite 550
Raleigh, NC 27608
(919) 856-2195

*Counsel for Appellant*

*Counsel for Appellant*

GibsonMoore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2212__     Caption: Jacobs v. NC Administrative Office of the Courts; Jan Kennedy in her

official capacity as New Hanover County Clerk of Superior Court

Pursuant to FRAP 26.1 and Local Rule 26.1,

Christina Lynn Jacobs
_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent
     corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                                  ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Vanessa K. Lucas                    Date:    October 9, 2013

Counsel for: Appellant

## CERTIFICATE OF SERVICE
****************************

I certify that on ___October 9, 2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Vanessa K. Lucas                              October 9, 2013
      (signature)                                    (date)

**TABLE OF CONTENTS**

PAGE:

TABLE OF AUTHORITIES...........................................iv

JURISDICTIONAL STATEMENT........................................1

STATEMENT OF THE ISSUES.........................................1

STATEMENT OF THE CASE...........................................2

STATEMENT OF FACTS..............................................3

      Plaintiff's Disability......................................3

      Plaintiff's Employment with the Clerk of Court.............5

      Disclosure of Disability....................................7

      Plaintiff's Discharge......................................10

SUMMARY OF ARGUMENT............................................12

ARGUMENT.......................................................13

      I.   Standard of Review.....................................13

      II.  Ms. Jacobs Has Forecast Sufficient Evidence of
          Retaliation...........................................14

          A.   Direct and Indirect Evidence....................15

               1.   Disparate Treatment......................16

               2.   Adverse Reaction to Disability and
                    Reasonable Accommodation Request..........17

          B.   Burden-Shifting Method..........................20

                1.   Ms. Jacobs Engaged in Protected
                    Activity by Requesting an Accommodation....21

                2.   Ms. Jacobs Suffered an Adverse Action......22

                3.   The Termination Was Causally Related to
                    Ms. Jacobs' Request for Accommodation......22

4.    The Asserted Reasons for Ms. Jacobs'
Termination Are Pretextual.................24

III. A Reasonable Jury Could Find that Defendants
Engaged in Disability Discrimination.................25

A.    Ms. Jacobs is an Individual with a
Disability as Defined in the ADAAA..............26

B.    Ms. Jacobs Was an "Otherwise Qualified"
Individual......................................31

C.    The Circumstances and Timing of Ms. Jacobs'
Discharge Raise a Strong Inference of
Unlawful Discrimination.........................33

1.    The Timing of the Termination Raises a
Strong Inference of Discrimination........34

2.    The Other Circumstances of the
Termination Raise A Strong Inference of
Discrimination............................35

D.    Defendants' Proffered Reasons for Ms.
Jacobs' Termination are Pretext for
Discrimination..................................39

1.    Stated Reason at the Time of
Termination...............................41

2.    EEOC Charge Response......................42

3.    Post-Charge Response and Litigation.......44

VI.   Defendants' Failure to Provide a Reasonable
Accommodation Violated the ADA.....................46

A.    Defendants Knew of Ms. Jacobs' Disability
and Her Request for a Reasonable
Accommodation...................................46

1.    Defendants Were Aware of Ms. Jacobs'
Disability................................46

2.    Defendants Were Aware of Ms. Jacobs'
Request for Accommodation.................47

B.   Ms. Jacobs was Able to Perform the Essential
     Functions of a Deputy Clerk and Sought an
     Accommodation that Was Reasonable Under the
     Circumstances...................................48

CONCLUSION....................................................52

REQUEST FOR ORAL ARGUMENT.....................................53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

PAGE(S):

**CASES:**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)....13

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)....13

*Cohen v. Abbott Lab.*,
    1999 U.S. App. LEXIS 7987 (4th Cir. 1999) .................14

*Craddock v. Lincoln Nat'l Life Ins. Co.*,
    2013 U.S. App. LEXIS 14797 (4th Cir. 2013) ...........16, 17

*Doe v. University of Md. Medical Sys. Corp.*,
    50 F.3d 1261 (4th Cir. 1995) ...............................14

*EEOC v. Fed Express Corp.*,
    513 F.3d 360 (4th Cir. 2008) ...............................51

*EEOC v. Sears Roebuck & Co.*,
    243 F.3d 846 (4th Cir. 2001) .........................40, 45

*EEOC v. Stowe-Pharr Mills, Inc.*,
    216 F.3d 373 (4th Cir. 2000) ....................25, 26, 39

*Ennis v. National Ass'n of Business and Educ. Radio, Inc.*,
    53 F.3d 55 (4th Cir. 1995) .................................35

*Ercegovich v. Goodyear Tire & Rubber Co.*,
    154 F.3d 344 (6th Cir. 1998) ...............................39

*Gaul v. Lucent Technologies, Inc.*
    134 F.3d 576 (3rd Cir 1998) ...............................31

*Haneke v. Mid-Atlantic Capital Mgmt*,
    131 Fed. Appx' 399,
    2005 U.S. App. LEXIS 8186 (4th Cir. 2005) .................51

*Haulbrook v. Michelin N. Am., Inc.*,
    252 F.3d 696 (4th Cir. 2001) ..........................*passim*

*Higgins v. E.I. DuPont de Nemours & Co.*,
    863 F.2d 1162 (4th Cir. 1988) ..............................13

*Hill v. Lockheed Martin Logistics Mgmt.,*
    354 F.3d 277 (4th Cir. 2004) ..........................15, 26

*Kravits v. Shinseki,*
    2012 U.S. Dist. LEXIS 24039,
    2012 WL 604169 (W.D. Pa. 2012)...........................27

*Mercantile Peninsula Bank v. French,*
    499 F.3d 345 (4th Cir. 2007) ..........................14, 33

*Molina v. DSI Renal, Inc.,*
    840 F. Supp. 2d 984 (W.D. Tex. 2012).....................30

*Reeves v. Sanderson Plumbing Prods.,*
    530 U.S. 133 (2000)...................................24, 39

*Rhoads v. FDIC,*
    257 F.3d 373 (4th Cir. 2001) ....................14, 15, 21

*Schmidt v. Safeway Inc.,*
    864 F. Supp. 991 (D. Or. 1994)...........................46

*St. Mary's Honor Ctr. v. Hicks,*
    509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)...40

*Tate v. Farmland Indus., Inc.,*
    268 F.3d 989 (10th Cir. 2001) .......................32, 50

*U.S. Airways v. Barnett,*
    535 U.S. 391 (2002)......................................51

*Wilson v. Phoenix Specialty Mfg. Co.,*
    513 F.3d 378 (4th Cir. 2008) ..........................40

**STATUTES:**

28 U.S.C. § 1291.............................................1

28 U.S.C. § 1331.............................................1

29 U.S.C. § 701 (Rehabilitation Act)...................1, 2, 14

42 U.S.C. § 12101 (ADA)..................................*passim*

42 U.S.C. § 12102(1)(A)-(C).................................26

42 U.S.C. § 12102(4)(A)(B).................................27

42 U.S.C. § 12111(8)..........................................31

42 U.S.C. § 12203(a)..........................................14

**REGULATIONS:**

29 C.F.R. § 1630 App. § 1630.2(n)......................31–32, 49

29 C.F.R. § 1630.1(c)(4)......................................27

29 C.F.R. § 1630.2(i)(1)(i)...................................26

29 C.F.R. § 1630.2(j)(1)(ii)..................................29

29 C.F.R. § 1630.2(j)(1)(iii).................................27

29 C.F.R. § 1630.2(j)(4)(i)...................................28

29 C.F.R. § 1630.2(m).........................................31

29 C.F.R. § 1630.2(n)(2)...................................49, 50

29 C.F.R. Part 1630 App., § 1630.1(c).........................27

29 C.F.R. Part 1630 App., § 1630.2(j)(1)(ii)...............29–30

29 C.F.R. Part 1630 App., § 1630.2(j)(1)(iii).................27

29 C.F.R. Part 1630 App., § 1630.2(j)(1)(vi)..................30

29 C.F.R. Part 1630 App., § 1630.2(j)(4)......................28

76 Fed. Reg. 16978 (Mar. 25, 2011)....................27, 28, 30

**RULES:**

Fed. R. App. P. 4(a)(1)(A).....................................1

Fed. R. Civ. P. 35...........................................29

Fed. R. Civ. P. 56(c)........................................13

**OTHER:**

*EEOC Enforcement Guidance: Reasonable Accommodation and
Undue Hardship Under the Americans with Disabilities Act*,
    Notice No. 915.002 (Oct. 17, 2002).......................46

## JURISDICTIONAL STATEMENT

The Complaint in this action was filed August 16, 2011 in the United States District Court for the Eastern District of North Carolina alleging claims under the Americans with Disabilities Act. The Amended Complaint filed on March 12, 2012 added claims under the Rehabilitation Act and state common law. The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

The District Court entered its final Order and Judgment in this matter on September 3, 2013. The Fourth Circuit has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 as an appeal of a final judgment entered by the District Court on September 3, 2013.

Appellant filed a Notice of Appeal on September 30, 2013 as required by Rule 4(a)(1)(A), Fed. R. App. P.

## STATEMENT OF THE ISSUES

1. Whether Defendants established as a matter of law that Ms. Jacobs was not retaliated against where she asked for a reasonable accommodation and was fired shortly thereafter.

2. Whether Defendants established as a matter of law that Ms. Jacobs is not a qualified individual with a disability as defined by the Americans With Disabilities Act (ADA), as amended, and the Rehabilitation Act, where expert testimony supported a determination that Plaintiff has a disability;

and whether the District Court erred in concluding that Plaintiff does not have a disability where the decision issued by that Court made no reference to the fact that Plaintiff proffered expert testimony on the issue of disability.

3. Whether Defendants established as a matter of law that Ms. Jacobs' termination did not violate the ADA, Rehabilitation Act and North Carolina common law.

4. Whether Defendants failed to provide Ms. Jacobs a reasonable accommodation.

5. Whether Defendants failed to engage in an interactive process with Ms. Jacobs, after she requested an accommodation, to determine whether a reasonable accommodation was feasible.

## STATEMENT OF THE CASE

Plaintiff-Appellant Christina Jacobs, formerly a deputy clerk for Defendant-Appellee New Hanover County Clerk of Court, filed this action on August 12, 2011, asserting claims for violation of the Americans with Disabilities Act. Plaintiff-Appellant Jacobs amended her Complaint on March 12, 2012, adding claims under the Rehabilitation Act and North Carolina common law. Defendants-Appellees filed a Motion for Summary Judgment on October 31, 2012. On September 3, 2013, the District Court

entered an Order granting summary judgment and dismissing the action with prejudice.

Plaintiff-Appellant Jacobs filed her Notice of Appeal on September 30, 2013.

## STATEMENT OF FACTS

**Plaintiff's Disability.**

Ms. Jacobs, a 27-year-old resident of New Hanover County, suffers from social anxiety disorder. She was diagnosed with social anxiety disorder by Dr. Judith Lipchin, her family doctor. J.A. 802, 891, 1072. She sought treatment for the disorder while she was in college. J.A. 819, 891-892, 902.

Ms. Jacobs' disability denies her the benefits of a social life, having close friends, and intimate relationships. J.A. 920. Interacting with others is very overwhelming for Ms. Jacobs. J.A. 903. Ms. Jacobs starts to feel sick in situations in which others would have no fear. *Id.* Since Ms. Jacobs was a child, she has had problems falling asleep and staying asleep because she is panicking, especially if she is nervous about something happening the next day or even in a week or a month. J.A. 916. Ms. Jacobs loses her appetite and she has trouble eating. *Id.* If something makes her particularly nervous, she will not be able to eat and will often go a day or two without eating. J.A. 916, 918.

Plaintiff's expert witness, Dr. Claudia Coleman, determined that "Ms. Jacobs does suffer from a mental disorder that substantially limits one or more major life activities, such as Ms. Jacobs' capacity to communicate with and interact with others in a wide range of situations, both socially and occupationally." J.A. 807. Dr. Coleman diagnosed Ms. Jacobs with Social Phobia (Social Anxiety Disorder), Generalized Type Anxiety Disorder, NOS, with panic attack and agoraphobia and Dysthymia. *Id.* Dr. Coleman's report and declaration are based upon not only a review of medical records and documents, but upon in-person examination and testing of Ms. Jacobs. J.A. 799-800, 802-803. Dr. Coleman also reports that Ms. Jacobs' medical records indicate that Ms. Jacobs has had significant difficulties with anxiety since she was quite young, pointing to a psychological report from when Ms. Jacobs was 10-years-old. J.A. 803, 1328-1335.

Social anxiety disorder does not entail a lack of desire for social interaction. Rather, the condition can cause extraordinary stress in interactions with others. Dr. Coleman reported that "[Ms. Jacobs] noted that while she essentially was withdrawn due to her social fears, she wanted to have relationships with others." J.A. 804. In Ms. Jacobs' case, the anxiety stems in significant part from being in circumstances where she has unclear direction or guidance. "She experienced

4

intense anxiety when asked questions she was unable to answer or had duties she felt untrained to do and also had intense anticipatory anxiety that was present even when not actually confronted by these situations." J.A. 807-808.

**Plaintiff's Employment with the Clerk of Court.**

On January 7, 2009, Ms. Jacobs began working as an office assistant in the Criminal Division of the New Hanover County Clerk of Court's Office. J.A. 864. She was hired by Brenda Tucker, who was at that time the New Hanover County Clerk of Superior Court. J.A. 981-982. As an office assistant, Ms. Jacobs was responsible for microfilming and filing. J.A. 863, 943. Ms. Jacobs was promoted to a deputy clerk on February 3, 2009. J.A. 67, 867.

The education requirement for a deputy clerk position is a high school diploma. J.A. 1017. Ms. Jacobs is a graduate of the University of North Carolina at Wilmington where she majored in English and Criminal Justice with a grade point average of 3.1258. J.A. 860, 1045-1046.

For a period after her promotion, Ms. Jacobs' duties were the same, but as of March 2009, her duties as a deputy clerk were to provide customer service at the front counter, perform data entry, and assist court personnel and the public, along with her previous office assistant duties. J.A. 641-642, 867-868. There were approximately 30 deputy clerks in the Criminal

Division of the Clerk of Court's office at the time of Ms.
Jacobs' employment. J.A. 433, 674-676. All of the deputy clerks
were trained to work at the front counter. J.A. 433-435. Two
deputy clerks at a time worked the front counter, while other
deputy clerks performed other tasks, such as dispositions,
cashier, intake, courtroom clerk, filing, orders for arrest,
data entry, calendars and bookkeeping. J.A. 433-434. Ms. Jacobs'
schedule consisted of working four days at the front counter and
one day microfilming. J.A. 879. She was supervised by Jan
Kennedy (now the Clerk of Court), Debra Excell, and Melissa
Griffin. J.A. 845, 945, 970, 980.

Ms. Jacobs was trained on the front counter and office
assistant duties by Ashley English. J.A. 837, 868. Ms. English
had been a deputy clerk for a few months when she trained Ms.
Jacobs. J.A. 674, 835-836, 994. Ms. Jacobs watched and took
notes while Ms. English performed the front desk duties for
about a week and then Ms. Jacobs took over the duties. J.A. 868,
871-872. Ms. English and Ms. Jacobs only covered a small
percentage of what could happen at the front desk during that
week. J.A. 872. Ms. English thought that Ms. Jacobs was doing
fine when she trained her. J.A. 839.

Ms. Jacobs worked at the front counter for nearly seven
months. J.A. 676. During her employment, Ms. Jacobs was never
written up for anything. J.A. 37, 1015. Her personnel file does

not contain any notes critical of her performance, either as an office assistant or as a deputy clerk. J.A. 37, 1015, 1018-1019.

At the front counter, there could be many different situations for deputy clerks to handle. J.A. 846. Deputy clerks could never know the answer to every question that could be asked. J.A. 834. Not every question that the public asked would have serious consequences if answered incorrectly, but the nature of the work in the Criminal Division meant that errors could have serious consequences. J.A. 856.

Although Ms. Jacobs enjoyed working at the front counter, the weight of not knowing the response to every question and the importance of getting the responses correct caused Ms. Jacobs to experience some of the more severe symptoms of her social anxiety disorder. J.A. 819, 870, 874, 904-909. The symptoms Ms. Jacobs experienced included finding it hard to breathe, having a racing heart, and having trouble catching her breath and calming her body down. Her body would shake, and she would have random crying spells and sudden feelings of dread. She experienced extreme stress, bouts of nervousness, and panic attacks. J.A. 23, 904-909.

**Disclosure of Disability.**

On or about May 5, 2009, approximately two months after she was assigned to the front counter, Ms. Jacobs went to a supervisor, Ms. Debra Excell, and told her that she had social

anxiety disorder and was not feeling healthy at the front counter. J.A. 202, 820, 851-852, 873-875, 893-894. Ms. Jacobs shared that she was concerned about it reflecting badly if people saw that she was nervous. J.A. 893-894. Ms. Jacobs asked Ms. Excell about returning to the office assistant position. J.A. 873-875. Ms. Excell encouraged Ms. Jacobs to continue with the job at the front counter, as she was improving. J.A. 873-875, 893-894. She said that everyone has the same concerns at the front counter, especially when they are new. J.A. 894. Ms. Jacobs shared with Ms. Excell that she might have to go back to the doctor and try medications that she had used in the past. J.A. 851, 875. Ms. Excell encouraged her to do so. *Id.*

Ms. Excell spoke with Brenda Tucker, the Clerk of Court at the time, about her conversation with Ms. Jacobs. J.A. 853, 997. Ms. Tucker made notes of that conversation, which were placed in Ms. Jacobs' personnel file. J.A. 997. Ms. Tucker wrote: "too stressful," "dreading coming to work", "nerve issue" and "anxiety disorder." J.A. 823, 997. The note indicated that Ms. Jacobs "might have to go back to Dr. worried may be a problem and don't want to reflect badly." *Id.* Ms. Tucker's assistant, Alice Radewicz, added the date and Ms. Jacobs' name to the note and placed it in Ms. Jacobs' personnel file. J.A. 823, 971-973.

Ms. Jacobs went to Masonboro Family Medicine on May 26, 2009 about her concerns over the symptoms she was experiencing

8

since she began working at the front counter. J.A. 876, 884-886, 1072-1073. Ms. Jacobs was prescribed Lexapro. *Id.* She was switched to Prozac at her follow up visit on June 30, 2009. J.A. 889-890, 1074.

Because she was still having difficulty managing her disability while working at the front counter, on September 8, 2009 Ms. Jacobs sent an email to her three supervisors with the subject line "Front Counter Accommodation." J.A. 798. Ms. Jacobs wrote:

> As I mentioned briefly since I began my employment here, I was diagnosed with Social Anxiety Disorder, which often limits my ability to perform under stress.
>
> Since beginning work at the front counter in March 2009, I have been doing my best with what I have been given. I have spoken with my doctor about my condition worsening under the pressure of my new job and have been trying different medications that should allow me to better handle stress. In spite of the medications, however, I am still having difficulty managing my condition at the front counter.

*Id.* Ms. Jacobs did not ask to be taken completely off the front counter, but to work with the Clerk's Office to adjust her role within the office. *Id.* She asked to be trained to perform other tasks handled by deputy clerks. *Id.* She concluded: "Under the circumstances of my disability, I need to do whatever I can to accommodate so that I can continue to contribute to the successfulness of the Clerk's Office." *Id.*

9

On September 9, 2009, Ms. Jacobs went to supervisor Jan Kennedy to follow up on her email. J.A. 895-896, 949-950. Ms. Kennedy file stamped the accommodation request email on September 9, 2009, because she considered it a request to be moved and she thought it was important. J.A. 798, 951. Although Ms. Kennedy, Ms. Excell, and Ms. Griffin had the authority to, and regularly did, make assignment changes, Ms. Kennedy told Ms. Jacobs that the matter needed to be handled by Ms. Tucker. J.A. 895-896, 948-950, 975-976, 987-988. Ms. Tucker was out of the office at that time on a combination of vacation and personal business. J.A. 387. As a result, Ms. Jacobs forwarded the email to Ms. Tucker on September 9, 2009 and indicated that she would come by Ms. Tucker's office to discuss it when Ms. Tucker returned to the office. J.A. 824, 895.

When Ms. Jacobs attempted to use some of her accrued leave time to get through the waiting period to have her accommodation request addressed, she was questioned by Ms. Kennedy about why she wanted leave and then the requests were denied. J.A. 326-327, 821. Previous leave requests were not met with questioning and had always been approved. J.A. 821.

**Plaintiff's Discharge.**

Ms. Tucker returned to the office on September 29, 2009. J.A. 896, 999. Ms. Jacobs saw Ms. Tucker in the break room and asked if they could meet. J.A. 896-897. When Ms. Jacobs went to

10

meet with Ms. Tucker, all three of Ms. Jacobs' supervisors were already in Ms. Tucker's office. J.A. 897, 962-964. Ms. Jacobs could see her accommodation request, with handwritten notes on it, on Ms. Tucker's desk.  J.A. 824,912. The handwritten notes had been made by Ms. Tucker. J.A. 1003.

Ms. Tucker's handwritten notes, produced in response to the Equal Employment Opportunity Commission ("EEOC") investigation, related to: Ms. Jacobs' disclosure of her social anxiety disorder; the days Ms. Jacobs took sick leave after she asked for an accommodation; a notation suggesting that Ms. Jacobs had been offered the office assistant position previously and refused; and an allegation that Ms. Jacobs "lied in the beginning" with reference to her ability to perform front counter work. J.A. 824, 1003-1013.

Ms. Jacobs believed the meeting was regarding her request for accommodation. J.A. 581. Ms. Jacobs recorded the meeting because she knew that she would be nervous going to speak with Ms. Tucker and wanted a recording to remember what Ms. Tucker said and to refer back to if necessary. In Ms. Jacobs' previous meeting with Ms. Tucker in May 2009, she had been surprised by some of the things Ms. Tucker discussed. J.A. 581-583. Ms. Jacobs later transcribed the recording. J.A. 581-582, 825-826. In the meeting, Ms. Jacobs stated that she wanted to talk about what was in the email. J.A. 825-826. Ms. Tucker clarified that

11

what Ms. Jacobs wanted was to be moved from the front counter. *Id.* Ms. Tucker stated that she had told Ms. Jacobs in the interview what the job was like and that Ms. Jacobs had told her that it would not be problematic for her. *Id.* Ms. Jacobs responded that she did not think that it would. *Id.* Ms. Tucker then told Ms. Jacobs that she was not "getting it," there was nowhere to move Ms. Jacobs, and that she was terminating Ms. Jacobs' employment. *Id.*

At the time Ms. Jacobs was terminated, the Clerk's office was under a hiring freeze; there was no means to replace Ms. Jacobs after her termination. J.A. 37.

Ms. Jacobs filed a timely Charge of Discrimination with the EEOC. J.A. 21-22, 32. During the EEOC investigation, Ms. Tucker denied that she knew of Ms. Jacobs' disability and denied that she was aware of the email requesting an accommodation at the time she fired Ms. Jacobs. J.A. 681, 687, 690.

Ms. Jacobs received a favorable Determination from the EEOC. J.A. 22, 32. The U.S. Department of Justice Civil Rights Division issued a Right to Sue letter and Ms. Jacobs filed suit in a timely manner. *Id.*

### SUMMARY OF ARGUMENT

Ms. Jacobs was fired three (3) weeks after requesting an accommodation for her disability. Her supervisors declined to act on her request, pending the return of Ms. Tucker.

Immediately upon Ms. Tucker's return, she addressed Ms. Jacobs'
accommodation request by firing her. Defendants have offered
shifting rationales and conflicting statements regarding the
purported reasons for termination. The circumstances raise
questions of fact regarding whether Ms. Jacobs was retaliated
against and discharged on account of her disability and as an
alternative to providing her with an accommodation.

The District Court erred in granting summary judgment in
this case, relying solely on Defendant's expert in deciding that
Ms. Jacobs does not have a disability, and failing to even note
that Plaintiff had proffered the testimony of an expert.

There are significant questions of fact to be determined by
a jury, and summary judgment should therefore have been denied.

**ARGUMENT**

**I.    Standard of Review**

The Circuit Court's review of a grant of summary judgment
is *de novo*. *Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d
1162, 1167 (4th Cir. 1988). Summary judgment may be granted only
if there exists no genuine issue as to any material fact and the
moving party is entitled to judgment as a matter of law. *See*
Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed.
2d 265 (1986). A court must consider whether a reasonable jury

13

could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant. *Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007). In so doing, a court does not weigh evidence or make credibility determinations. *Id.*

Ms. Jacobs raised claims of disability discrimination in violation of the Americans with Disabilities Act (ADA), the Rehabilitation Act, and North Carolina common law and retaliation in violation of the ADA and the Rehabilitation Act. J.A. 20-29. These claims are based on the failure of the Clerk's Office to afford Ms. Jacobs a reasonable accommodation, and the termination of her employment. *Id.* Ms. Jacobs' claims under Title II of the ADA, Section 504 of the Rehabilitation Act, and North Carolina common law, are to be interpreted consistent with Title I of the ADA. *Doe v. University of Md. Medical Sys. Corp.*, 50 F.3d 1261, 1264-1265 (4th Cir. 1995); *see also Cohen v. Abbott Lab.,* 1999 U.S. App. LEXIS 7987, *18 (4th Cir. 1999)(applying federal methods and standards to state wrongful discharge claims).

## II.  Ms. Jacobs Has Forecast Sufficient Evidence of Retaliation

Regardless of whether an individual is otherwise protected by the ADA, the Act prohibits retaliation. 42 U.S.C. § 12203(a); *see also Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001)

14

(holding that a retaliation claim does not rely on whether the underlying discrimination claim is successful).

A plaintiff may establish a claim of retaliation, for purposes of summary judgment, through direct and indirect evidence, or, in the burden-shifting method, by establishing a *prima facie* claim and demonstrating that a jury could find the proffered reason for the adverse action was pretextual. *Rhodes, supra,* at 391("In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method"); *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284-85 (4th Cir. 2004)(noting that discrimination may be proven by direct evidence or by demonstrating pretext).

Ms. Jacobs has forecast direct and indirect evidence of retaliation, and has likewise produced sufficient evidence to support her retaliation claim under the burden-shifting method.

A.  Direct and Indirect Evidence

There is direct and indirect evidence of disparate treatment and aversion and hostility toward Ms. Jacobs' request for accommodation that would support a jury finding of retaliation. *See Rhoads, supra* at 393-394 (finding sufficient support for a retaliation claim based on direct and indirect evidence of close proximity in time, employer's comments, and other circumstances).

15

1.    *Disparate Treatment*

There were 30 deputy clerks working in the Criminal Division of the Clerk's office at the time of Ms. Jacobs' termination. J.A. 433, 674-676. All of the deputy clerks had been trained to work at the front counter, as well as to perform other duties. J.A. 433-435. Ms. Jacobs, in her request for accommodation, asked for the opportunity to spend less time at the front counter and to be trained in other areas as other deputy clerks had been. J.A. 433-435, 798. Ms. Tucker refused to afford Ms. Jacobs the same opportunity to train and work in other areas of the office. Instead, she told her: "I don't have any place that I can use your services." J.A. 825. Ms. Tucker made this statement even though deputy clerks were subject to assignment to different duties by the Clerk or her designees. J.A. 433-435, 975-976, 987-988. Notably, at the time of Ms. Jacobs' termination, the Clerk's office was under a hiring freeze. J.A. 37. Thus, eliminating Ms. Jacobs from her role would not have enabled Ms. Tucker to employ another deputy clerk to work at the front counter; she would have to assign one or more of the existing deputy clerks.

Such disparate treatment supports a conclusion that Ms. Jacobs was treated differently because of her request for accommodation. *See Craddock v. Lincoln Nat'l Life Ins. Co.*, 2013 U.S. App. LEXIS 14797, *11 (4th Cir. 2013)(holding that

16

allegation that plaintiff was denied training that was afforded to others could support a claim of disability discrimination).

In *Craddock*, the plaintiff contended that she had been treated differently because she was not provided training on certain tasks, where employees without disabilities were provided such training. *Id*. at *4. The plaintiff, who was unable to perform some of the duties assigned to her, argued that she would have been able to perform other duties if she were given training that was provided to employees without disabilities. *Id*. The Fourth Circuit first rejected the district court's dismissal based on the lack of allegations of animus toward individuals with disabilities. *Id*. at *10. The Court then concluded that disparate treatment with regard to training opportunities could suffice to support a claim of discrimination. *Id*. at *11.

Here, Ms. Jacobs did not receive the training she requested as part of her accommodation request and that had been provided to others; she was discharged instead. A jury could conclude that the refusal to afford Ms. Jacobs the same work opportunities was retaliatory.

2.    *Adverse Reaction to Disability and Reasonable Accommodation Request*

In addition to evidence of disparate treatment of Ms. Jacobs, there is direct evidence that her employer reacted

17

adversely to her disability and her accommodation request,
including expressions of hostility by Ms. Tucker.

Ms. Tucker wrote several comments on Ms. Jacobs' request
for accommodation that suggest a hostile reaction to the
request. At the top, she wrote "lied in the beginning /
explained front counter." J.A. 677. The implication appears to
be that Ms. Tucker believed the request indicated that Ms.
Jacobs had been dishonest about her abilities when she was
hired. At the meeting when Ms. Jacobs was fired, Ms. Tucker
similarly commented "when you were interviewed and hired, it was
explained to you about the work . . . you expressed that you
would be able to handle all of that, that it wouldn't be
problematic for you." J.A. 825. Ms. Jacobs responded "I didn't
think that it would." *Id.* Rather than discuss the need for an
accommodation, Ms. Tucker went on to fire Ms. Jacobs, telling
her "I don't have any place that I can use your services." *Id.*
Ms. Jacobs tried to explain that she would continue at the
counter rather than lose her job, but Ms. Tucker declined to
discuss it. J.A. 826. Thus, a jury could conclude that Ms.
Tucker was angry about the request and fired Ms. Jacobs as a
result.

Ms. Tucker also noted on the request the dates and times
Ms. Jacobs had been out or had to leave the office due to
illness since her accommodation request. J.A. 677. After

requesting an accommodation and being told she would need to wait for a response, Ms. Jacobs submitted leave requests in accordance with the Clerk's office procedures. J.A. 326-327, 821. Although her prior requests had not been questioned or denied, the leave requests made after September 9 were subject to additional scrutiny and denied. *Id.* This was so even though Ms. Jacobs had leave time still available at the time of her termination. J.A. 709, 821, 917. Ultimately, a jury could conclude that management's treatment of Ms. Jacobs' leave requests, and Ms. Tucker's notation of her absences, indicated an adverse reaction to Ms. Jacobs' accommodation request.

Other notations suggest Ms. Tucker was upset about Ms. Jacobs' accommodation email. Ms. Jacobs' email had stated: "As I mentioned briefly since I began my employment here, I was diagnosed with Social Anxiety Disorder." J.A. 677. Ms. Tucker apparently misunderstood and believed that "since I began my employment" referred to the diagnosis rather than the disclosure; she wrote on the email "told [Debra] Excell this was in college," suggesting that Ms. Jacobs was not telling the truth. J.A. 677. Again, a jury could look at this comment and the others and conclude that Ms. Tucker's reaction to the request was negative and led to Ms. Jacobs' termination.

Ms. Tucker's hostility toward the request may be inferred not only from what is in her notes, but what is <u>not</u> in her

19

notes. The notes do not contain any reference to any problems with Ms. Jacobs' performance, or other reasons that the Defendants have since asserted for Ms. Jacobs' termination. J.A. 677. Consequently, a jury could determine that Ms. Tucker's negative reaction, coupled with a lack of other comments related to reasons for termination, indicate that Ms. Tucker fired Ms. Jacobs in reaction to the request.

After Ms. Jacobs was terminated, Ms. Tucker wrote to the Administrative Office of the Courts that she had been reluctant to hire Ms. Jacobs because of her "mousiness." J.A. 689. Again, this negative characterization of Ms. Jacobs as mousy suggests that Ms. Tucker had interpreted Ms. Jacobs' social anxiety disorder and need for an accommodation as weaknesses, and a jury could find that it was this negative reaction that prompted the termination.

    B.    Burden-Shifting Method

Ms. Jacobs has identified sufficient direct and indirect evidence to support her retaliation claim. She has also produced evidence that supports her claim under the burden-shifting method.

Under the burden-shifting method of proof, a plaintiff must forecast evidence of: protected activity, adverse action, and a causal connection between the two. *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001). If the employer asserts

a nondiscriminatory reason for the termination, the plaintiff must forecast evidence that the stated reason is pretextual. *Rhoads, supra,* at 394. Summary judgment must be denied unless no reasonable jury could find that the employer's stated reason was pretextual. *Id.*

### 1.    *Ms. Jacobs Engaged in Protected Activity by Requesting an Accommodation*

Requesting an accommodation is protected activity. *Haulbrook, supra,* at 706 (noting request for an accommodation satisfied the protected activity prong of a retaliation claim).

Ms. Jacobs emailed all three of her supervisors on September 8, 2009 regarding her request for a "Front Counter Accommodation" and mentioned specifically her diagnosis of social anxiety disorder. J.A. 798. She asked to be trained in a different role and perhaps to work at the counter only once a week. *Id.* She closed by stating that "under the circumstances of my disability, I need to do whatever I can to accommodate so I can continue to contribute to the successfulness of the Clerk's Office." *Id.* Ms. Kennedy file-stamped the email on September 9, 2009, because it was a request to be moved and she thought it was important. J.A. 798, 951. Ms. Jacobs forwarded the email to Ms. Tucker on September 9, 2009. J.A. 824, 895. Thus, Ms. Jacobs has satisfied the first part of the burden-shifting method by demonstrating that she engaged in protected activity.

21

### 2. *Ms. Jacobs Suffered an Adverse Action*

Ms. Jacobs was terminated on September 29, 2009, three weeks after her request for a reasonable accommodation, satisfying the second prong of the burden-shifting test. J.A. 669, 798.

### 3. *The Termination Was Causally Related to Ms. Jacobs' Request for Accommodation*

The Fourth Circuit has held that a three week period between protected activity and termination establishes *prima facie* causation. *Haulbrook, supra,* at 706 (holding plaintiff established a question of fact "as to the causal connection between his accommodation request and termination, due solely to the proximity in time of his termination on November 25 and his assertion on November 4 of a right to accommodation under the ADA").

Ms. Jacobs was terminated three weeks after her email requesting accommodations. Thus, Ms. Jacobs has established *prima facie* causation. *Id.*

Moreover, Defendants contend that Ms. Tucker, who fired Ms. Jacobs, did not see the accommodation request until the day Ms. Jacobs was fired. J.A. 687, 690. This temporal proximity is even more direct than the three week period deemed sufficient in *Haulbrook*. Although Ms. Tucker now denies that she read the email prior to the firing, Ms. Jacobs' email requesting an

accommodation was on Ms. Tucker's desk when Ms. Jacobs arrived at Ms. Tucker's office on September 29, 2009. J.A. 824, 911-912. The request had been written on by Ms. Tucker. J.A. 1003. The notes themselves appear to relate to a review of the request, which would have been illogical for Ms. Tucker to conduct *after* having fired Ms. Jacobs. J.A. 824. Finally, the transcript and recording of the meeting indicate that, when Ms. Jacobs mentioned the email, Ms. Tucker appeared to know what Ms. Jacobs was talking about. J.A. 825-827. Thus, there is substantial evidence that Ms. Tucker fired Ms. Jacobs immediately after reviewing the request for accommodation.

Whether viewed as the three weeks from the initial request to the termination, or as an immediate reaction, the temporal proximity between Ms. Jacobs' request for accommodation and her termination sufficiently establish causation such that a jury could reasonably find in her favor on this issue. *Haulbrook* at 706.

Moreover, Ms. Jacobs was fired in the context of a discussion of her request for accommodation. Ms. Tucker's comments during the termination meeting indicate the termination was causally related to the request for an accommodation. Ms. Tucker told Ms. Jacobs "I don't have any place that I can use your services." J.A. 825, 827. Rather than saying that Ms. Jacobs was fired for misconduct or for other fault-based

23

reasons, Ms. Tucker's statement can be interpreted as a direct response to Ms. Jacobs' request: rather than accommodating the need for a change in duties, Ms. Tucker expressly relied on a purported inability to change Ms. Jacobs' job in firing her.

In light of the temporal proximity, which the Fourth Circuit has held to be sufficient in itself, as well as the context of the termination, Ms. Jacobs has forecast ample evidence of a causal connection between her protected activity and the adverse action.

> ### 4. The Asserted Reasons for Ms. Jacobs' Termination Are Pretextual

An asserted reason for an adverse action may be rebutted by a showing that the purported reason was pretext. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

Pretext is discussed in detail below, at Section III.D. In short, the reasons offered by Defendants have changed over time, are illogical, and are contradicted by Ms. Jacobs' testimony and Defendants' own witnesses. *See infra*, pp. 39-46. Ms. Jacobs was fired during a hiring freeze, when she could not be replaced; thus the allegation that she was too slow in her work would not have been a logical reason to reduce staff size. *See infra*, p. 42. The reasons asserted by Ms. Tucker in her response to the EEOC were different than the reason given to Ms. Jacobs at the time of termination, and included false statements that Ms.

Tucker did not know of Ms. Jacobs' disability or request for an accommodation. *See infra*, pp. 41-44. The additional reasons given to the EEOC and during discovery at the District Court level do not match the reasons given prior to litigation. *See infra*, pp. 44-46. Finally, Ms. Jacobs denies the post-hoc allegations asserted against her, requiring resolution by a jury of the factual dispute. *See infra,* pp. 39-46.

Direct and indirect evidence support a jury finding that Ms. Tucker reacted adversely to Ms. Jacobs' accommodation request, and discharged Ms. Jacobs as a result. Likewise, Ms. Jacobs has adduced sufficient evidence under the burden-shifting method to support a jury determination of liability. Because Ms. Jacobs has forecast sufficient evidence from which a jury could determine that Defendants retaliated against her for requesting an accommodation, the District Court erred in granting Defendants summary judgment on Plaintiff's retaliation claim.

## III. A Reasonable Jury Could Find that Defendants Engaged in Disability Discrimination

To establish a claim for disability discrimination, a plaintiff must prove: "that (1) she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [the employer] discharged her (or took other adverse employment action) because of her disability." *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000).

Like retaliation, disability discrimination may be proven through direct and indirect evidence or through a burden-shifting method. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284-85 (4th Cir. 2004)(noting that discrimination may be proven by direct evidence or by demonstrating pretext).

Evidence adduced at the summary stage would solidly support a jury determination that: 1. Ms. Jacobs has a disability; 2. She was otherwise qualified for her Deputy Clerk position; and 3. She was discharged under circumstances that give rise to an inference of discrimination. *See Stowe-Pharr Mills, supra,* at 377 (listing the elements of a disability discrimination claim).

A.    <u>Ms. Jacobs is an Individual with a Disability as Defined in the ADAAA</u>[1]

The term "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A)-(C). "Interacting with others" is a major life activity. 29 C.F.R. § 1630.2(i)(1)(i). The definition of "disability" is to be construed in favor of broad coverage and the term "substantially limits" is to be interpreted consistent with the findings and purposes of the ADA

---

[1] Defendants conceded, for summary judgment purposes, that Ms. Jacobs has a disability. J.A. 1027 ("For the sake of summary judgment, Defendants have conceded that Plaintiff had a disability."). Nevertheless, Ms. Jacobs' disability was addressed in the Order Granting Summary Judgment by the lower court relying on the Defendants' expert's opinion regarding disability but making no mention of Plaintiff's expert's opinion to the contrary. J.A. 1035, 1038.

Amendments Act of 2008. 42 U.S.C. § 12102(4)(A)(B). Congress amended the ADA in 2008 with "[t]he primary purpose" of making "it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4).

"The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii). *See also* 29 C.F.R. Part 1630 App., § 1630.2(j)(1)(iii), 76 Fed. Reg. 16978, 17009 (Mar. 25, 2011); *Kravits v. Shinseki,* 2012 U.S. Dist. LEXIS 24039, 2012 WL 604169, at *17 (W.D. Pa. 2012) ("Viewing the facts relevant to [plaintiff's back problems and fibromyalgia] in the light most favorable to him, and assessing those facts under the new, less searching analysis called for by the ADAAA, there is sufficient evidence to permit a reasonable jury to find that [plaintiff] has a disability"). "This construction is also intended to reinforce the general rule that civil rights statutes must be broadly construed to achieve their remedial purpose." 29 C.F.R. Part 1630 App., § 1630.1(c), 76 Fed. Reg. 16978, 17005 (Mar. 25, 2011).

27

Factors used to determine whether an individual is substantially limited in a major life activity include condition, manner, and duration in which the activity is performed. 29 C.F.R. § 1630.2(j)(4)(i). "Condition, manner, or duration may also suggest the amount of time or effort an individual has to expend when performing a major life activity because of the effects of an impairment, even if the individual is able to achieve the same or similar result as someone without the impairment." 29 C.F.R. Part 1630 App., § 1630.2(j)(4), 76 Fed. Reg. 16978, 17012 (Mar. 25, 2011).

Ms. Jacobs' medical records show a long history of anxiety. J.A. 803, 1071-1243, 1328-1335. The report of Plaintiff's expert, Dr. Claudia Coleman, details Ms. Jacobs' substantial limitations with regard to her "capacity to communicate with and interact with others in a wide range of situations," particularly with regard to the conditions, manner and duration of social interaction. J.A. 807. "[Ms. Jacobs] noted that she tries hard not to avoid people and limit herself, but still has overwhelming anxiety that leads to avoidance a lot of the times." J.A. 805. "In college she passed her courses, but her social anxiety prevented her from socializing with peers in a typical fashion. She did not date. Currently, she describes herself as only having 'work friends.'" *Id.* Ms. Jacobs could

only recall one day in college where she went to the beach and ate dinner with some acquaintances. J.A. 861-862, 917-918.

Defendants' expert, Dr. George Corvin, contends Ms. Jacobs is not an individual with a disability, but he did not conduct testing or examination of Plaintiff. J.A. 215. As Dr. Coleman notes, this significantly restricts Dr. Corvin's ability to assess Ms. Jacobs and the affect of her social anxiety disorder: "With respect to Ms. Jacobs, the direct observation/interview and test data were critical to the diagnosis of social phobia, as the findings of both were highly supportive of this diagnosis." J.A. 799-800.[2]

Further, Dr. Corvin applied incorrect standards in assessing disability. J.A. 217-223. For example, Dr. Corvin's analysis disregards the ADAAA's admonition that "[an impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). *See also* 29 C.F.R. Part 1630 App., §

---

[2] Dr. Corvin's report inaccurately states that Ms. Jacobs, through counsel, refused to submit to examination with Dr. Corvin. Defendants made no motion for a medical exam of Ms. Jacobs. *See* Fed. R. Civ. P. 35 ("The order [for a mental examination] . . . may be made only on motion for good cause and notice to all parties and the person to be examined.") Although on two occasions, Ms. Jacobs, through counsel, proactively raised the issue of Defendants' request to conduct a voluntary medical exam, Defendants did not pursue any exam until the final week of discovery. J.A. 828-829.

1630.2(j)(1)(ii), 76 Fed. Reg. 16978, 17008 (Mar. 25, 2011);
*Molina v. DSI Renal, Inc*., 840 F. Supp. 2d 984, 995 (W.D. Tex.
2012)("the fact that [Plaintiff] learned to work through her
pain to continue performing her regular tasks does not
necessarily preclude her from being considered disabled").

Likewise, Dr. Corvin wrongly emphasized that Ms. Jacobs has
not received treatment on an ongoing basis to manage her
condition or mitigate its effects. J.A. 222. The uncontradicted
evidence is that Ms. Jacobs sought treatment in May 2009
precisely because the symptoms of her disorder were intensifying
at work. J.A. 884-885, 1072-1073. Furthermore, under the ADAAA,
"the determination of whether or not an individual's impairment
substantially limits a major life activity is unaffected by
whether the individual chooses to forgo mitigating measures. For
individuals who do not use a mitigating measure (including for
example medication or reasonable accommodation that could
alleviate the effects of an impairment), the availability of
such measures has no bearing on whether the impairment
substantially limits a major life activity." 29 C.F.R. Part 1630
App., § 1630.2(j)(1)(vi), 76 Fed. Reg. 16978, 17010 (Mar. 25,
2011).

While the parties' respective experts disagree, Dr. Coleman
was better able to assess Ms. Jacobs through testing and
examination, and relied on the proper standard for determination

30

of disability. At most, the situation presents a classic dispute of fact between expert opinions that should not have been resolved at the summary judgment stage by the District Court's reliance on Defendants' expert to the complete exclusion of Plaintiff's expert. This is particularly so because Defendants conceded in their Reply brief to the District Court that they were not contesting the issue of disability for purposes of their Motion for Summary Judgment. J.A. 1027.

B.    Ms. Jacobs Was an "Otherwise Qualified" Individual

An individual is "qualified" if she meets the "skill, experience, education and other job-related requirements" of the position and can perform the essential functions of the job, with or without a reasonable accommodation. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m). There is a two part test to determine whether someone is a qualified individual with a disability: whether the individual satisfies the prerequisites for the position; and whether the individual can perform the essential functions of the position, with or without reasonable accommodation. *Gaul v. Lucent Technologies, Inc.* 134 F.3d 576, 580(3rd Cir 1998).

"The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. § 1630 App. §

31

1630.2(n). *See e.g. Tate v. Farmland Indus., Inc.,* 268 F.3d 989, 993 (10th Cir. 2001)(noting function must apply to all employees to be essential).

Ms. Jacobs has a Bachelors degree from UNC-W, while deputy clerk positions required only a high school diploma. J.A. 1017. She was promoted after a short period working for the Clerk's Office. J.A. 67, 867. There were no job qualifications that she did not meet.

Ms. Jacobs was performing the essential functions of her job at the time of her termination. Defendants never conducted a performance review for Ms. Jacobs nor did they issue any performance warnings to her. J.A. 878, 1015-1016. Rather, she was promoted after a month of employment and encouraged by her supervisor Ms. Excell to continue working in her deputy clerk position. J.A. 67, 867, 873-875, 893-894. There are no emails, file notes, memos or any other contemporaneous documentation indicating that Ms. Jacobs was not performing the essential functions of the deputy clerk job. J.A. 37, 1015, 1018-1019. In short, nothing in Ms. Jacobs' personnel file indicates that Defendants considered her performance inadequate prior to her request for accommodation and termination.

As detailed below regarding pretext in Section III.D *infra*, Defendants have raised a changing assortment of allegations against Ms. Jacobs regarding her performance, beginning after

her termination and continuing through the submission of affidavits in support of Defendants' Motion for Summary Judgment to the trial court. While there is a factual dispute between the parties, there is sufficient evidence from which a jury could reject Defendants' post-hoc, inconsistent assertions - made after Ms. Jacobs' termination - and determine that Ms. Jacobs was qualified for, and was performing the essential functions of her position. The factual dispute between the parties on this issue should be resolved by a jury. *See Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007)(noting that summary judgment determination is made without weighing evidence or making credibility determinations).

The record is clear that Ms. Jacobs met all of the published qualifications for the deputy clerk position and substantial evidence, including her early promotion and the lack of any documentation of job performance issues, demonstrates she was performing the essential functions of her job at the time of her termination. Therefore, she has met the "qualified individual" element of her disability discrimination claims.

C.    The Circumstances and Timing of Ms. Jacobs' Discharge
      Raise a Strong Inference of Unlawful Discrimination

The timing, circumstances, and changing rationales related to Ms. Jacobs' termination are strong indicia that her discharge was the result of unlawful discrimination.

1.   *The Timing of the Termination Raises a Strong*
     *Inference of Discrimination*

As discussed in detail in Section II, *supra*, the
uncontested facts show: Ms. Jacobs sent an email on September 8,
2009 that specifically addressed Ms. Jacobs' disability of
social anxiety disorder. J.A. 798. She forwarded the request by
email to Ms. Tucker on September 9, 2009. J.A. 824. Ms. Kennedy
informed Ms. Jacobs that she would have to wait until Ms. Tucker
returned to the office to have her request addressed, despite
Ms. Kennedy, Ms. Excell, and Ms. Griffin having the ability and
responsibility to engage with Ms. Jacobs concerning her request.
J.A. 895-896, 948-950, 975-976, 987-988. Ms. Tucker returned on
September 29, 2009 and fired Ms. Jacobs that day. J.A. 669, 896,
999.

A jury could very reasonably conclude that Ms. Tucker
decided to fire Ms. Jacobs either on the very day that she saw
the emailed disability accommodation request, or on the day she
returned to the office and learned that Ms. Jacobs had made her
disability an issue and requested accommodation. In either
event, the temporal relation between the email about Ms. Jacobs'
disability and need for accommodation and the termination would
support a jury finding of causation. *Haulbrook, supra,* at 706.

2.    *The Other Circumstances of the Termination Raise
A Strong Inference of Discrimination*

In addition to the close temporal proximity, other circumstances of Ms. Jacobs' termination support a jury determination of discrimination. *See Ennis National Ass'n of Business and Educ. Radio, Inc., supra*, 53 F.3d 55, 58 (4th Cir. 1995)(identifying circumstances that raise a reasonable inference of discrimination as supporting an ADA claim).

First, Ms. Tucker was under a hiring freeze, making it illogical to terminate an employee for being slow if she could not hire a replacement. J.A. 37, 825.

Next, the evidence points to Ms. Jacobs' request to have her disability accommodated as a turning point in her employment. When Ms. Jacobs requested an accommodation and put her disability front and center in writing, her supervisors consciously determined to take no action until Ms. Tucker returned. J.A. 309, 482-484, 577, 854-855. The refusal to engage with Ms. Jacobs about her request and address the employer's role in the interactive process is indicative of a lack of willingness to address Ms. Jacobs' disability. Similarly, the refusal to grant Ms. Jacobs' leave requests supports an inference of an adverse reaction to Ms. Jacobs raising an issue regarding her disability. J.A. 315-317.

When Ms. Tucker returned to the office, three weeks after the accommodation request, she first met with the three supervisors to whom Ms. Jacobs had originally sent her request for accommodation. J.A. 681, 897, 962-964, 999-1000. When she called Ms. Jacobs into the meeting, all three supervisors were present and the email Ms. Jacobs had sent requesting an accommodation was on Ms. Tucker's desk with Ms. Tucker's notes on it. J.A. 681, 824, 912. The notes include input specifically derived from others (e.g. "told Excell this was in college" and sick leave information for the period Ms. Tucker was away). A reasonable inference to be drawn here is that Ms. Tucker discussed Ms. Jacobs' disability and accommodation request with Ms. Jacobs' supervisors, made notes on the request, and then called Ms. Jacobs in and terminated her employment.

Ms. Tucker has made implausible statements about when she printed and read the email. Ms. Tucker claims that during the termination meeting, when Ms. Jacobs mentioned the email, Ms. Tucker pulled it out and read it at that time. J.A. 681, 1001. The recording of the meeting makes clear that there was no pause to "find" the email and pull it out. J.A. 827. During her deposition, Ms. Tucker was asked about when she would have printed the email, so that it could have been accessed during the meeting if, as she claimed, she had not been reading emails while out of the office for three weeks. J.A. 1001. Ms. Tucker

said she could not remember printing the email, but claimed that she did not think she printed the email before the meeting, because she did not know about the email. *Id.*

Ms. Tucker's testimony is contrary to the documentary evidence and is illogical. It is implausible that she would have been able to locate the particular email during the meeting and read it, if she had not already read it and known exactly where it was on her desk. In addition to this being a direct contradiction to Ms. Jacobs' unchanging and clear memory of seeing the email on Ms. Tucker's desk, the recording and transcript are devoid of any indication that Ms. Tucker did what she has claimed. J.A. 743, 827. Furthermore, the very reason that Ms. Jacobs' supervisors gave for taking no action on her request for accommodation was that they needed to discuss it with Ms. Tucker first. J.A. 309, 482-484, 854-855. It is not logical that they waited three weeks to have this conversation with Ms. Tucker and then simply failed to mention it during a meeting specifically relating to Ms. Jacobs' employment.

Further, Ms. Tucker's attitude towards Ms. Jacobs during the termination meeting and in her notes showed hostility that a jury could infer is due to Ms. Jacobs' disability and request for accommodation. J.A. 825-827.

The content of the notes on Ms. Tucker's copy of the accommodation email is consistent with a hostile reaction rather

than a performance-based termination. J.A. 677. The notes say nothing about Ms. Jacobs' job performance or any of the other purported reasons Defendants have since given for Ms. Jacobs' termination. J.A. 824. Rather, they all relate to Ms. Tucker's view of Ms. Jacobs' statements about her disability and why Ms. Jacobs should not be accommodated ("explained front counter" and "I offered her an OA [office assistant] previously / she refused") and to Ms. Jacobs' requests for leave while she was awaiting a discussion of her need for accommodation. *Id.*

Defendants' version of the circumstances regarding Ms. Jacobs' termination requires a jury to believe: Ms. Tucker met with Ms. Jacobs' supervisors, but had no conversations regarding Ms. Jacobs' disability or the accommodation request with the supervisors who had waited three weeks to talk with her about it; then, called Ms. Jacobs into the meeting, terminated her employment and later read and printed out the email to make notes regarding Ms. Jacobs' job performance and sick leave to put in her personnel file. By contrast, there is ample, consistent, and coherent evidence from which a jury could conclude that: Ms. Tucker read Ms. Jacobs' email and discussed it with other management; she then made notes on the print-out reflecting her thoughts about Ms. Jacobs' disability, her ability to do her job, and her accommodation request; and then called Ms. Jacobs in and fired her.

38

The trial court's grant of summary judgment should be reversed because the evidence would support a jury determination that Ms. Jacobs was an otherwise qualified individual with a disability who was fired under circumstances that give rise to an inference of discrimination. *Stowe-Pharr Mills, supra,* at 377.

### D.   Defendants' Proffered Reasons for Ms. Jacobs' Termination are Pretext for Discrimination

If a nondiscriminatory reason for an adverse action is offered, it may be rebutted by a showing that the purported reason was pretext. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000). Pretext can be shown by establishing that the reasons proffered were false and "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 147. "Ultimately, whether a jury chooses to believe the [plaintiff's or defendant's] version of events depends on the credibility of each party's witnesses, and credibility determinations are for the jury to decide." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998).

To establish pretext, it is sufficient to show that the proffered reasons were false. *Id.* at 147 ("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination")

(citations and emphasis omitted). "(T)he trier of fact's 'rejection [or disbelief] of the [employer's] proffered reasons [for its actions] will permit the trier . . . to infer the ultimate fact of intentional discrimination.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *see also Wilson v. Phoenix Specialty Mfg. Co.*, 513 F.3d 378, 387 (4th Cir. 2008)(noting the district court's disbelief of employer's proffered reasons for employee's termination was based in part on the court's determination that the reasons the company gave to the EEOC were different than the one advanced at trial).

The question on a motion for summary judgment is "whether [defendant] has presented evidence such that 'no reasonable factfinder' could conclude that" its actions were discriminatory. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 854 (4th Cir. 2001).

Defendants have taken implausible, changing positions with regard to the reason for Ms. Jacobs' termination. Such shifting rationales indicate that the reasons offered were pretextual. *See id.* at 852-853 ("the fact that [defendant] has offered different justifications at different times . . . is, in and of itself, probative of pretext").

When Ms. Jacobs was discharged, she was told it was because she wasn't "getting it." J.A. 1001. A review of their evolving

40

positions over time shows that Defendants have attempted to expand the rationale in order to cast Ms. Jacobs in an increasingly bad light, and that significant evidence rebuts Defendants' various claims.

### 1.    Stated Reason at the Time of Termination

Ms. Tucker told Ms. Jacobs she was being fired for being slow and not "getting it." Defendants admit "Ms. Tucker told plaintiff that budget cuts necessitated that all employees take on more tasks to keep the office running efficiently." J.A. 36. At the time, the Clerk's office was under a hiring freeze. J.A. 37. It is illogical for the Clerk to have fired Ms. Jacobs for being slow and not "getting it," when the termination would result in fewer people to do the existing work. On its face, the original reason for termination is illogical.

While Ms. Tucker noted Ms. Jacobs' anxiety disorder in her personnel file, and Ms. Kennedy detailed Ms. Jacobs' leave requests after the accommodation email, Ms. Jacobs' file is devoid of write-ups or corrective actions for any of the reasons subsequently offered for her termination. J.A. 37, 823.

Thus, a jury could reasonably reject the Defendants' original reason for termination, particularly in light of the timing and circumstances in relation to Ms. Jacobs' accommodation request and assertion of her disability.

41

### 2.  *EEOC Charge Response*

Ms. Tucker wrote to the EEOC: "I had no knowledge of any disability or work impairment until after the decision to terminate." J.A. 687. In actuality, Ms. Tucker's note in May 2009 specifically identified Ms. Jacobs' anxiety disorder and noted Ms. Jacobs' comments that working at the front counter concerned her in relation to her disorder. J.A. 823.

Ms. Tucker told the EEOC: "Ms. Jacobs never mentioned or even alluded to the fact that she had a disability or any medical condition that would keep her from fulfilling the duties of a Deputy Clerk." J.A. 687. Again, Ms. Tucker's note – written in relation to Ms. Jacobs' first request for accommodation in May 2009 – specifically contradicts this assertion. There, Ms. Tucker wrote "nerve issue", "anxiety disorder," "worried there may be a problem" and "don't want to reflect badly." J.A. 823, 997. Ms. Tucker "vehemently denied" that she had any knowledge of Ms. Jacobs' disability or that she read the email from Ms. Jacobs prior to terminating her. J.A. 687-688. As noted above, these statements are false: her own May 2009 note indicates her knowledge of Ms. Jacobs' disability and the facts and circumstances of Ms. Jacobs' termination – and the direct evidence from Ms. Jacobs – demonstrate that Ms. Tucker had read Ms. Jacobs' request prior to terminating her.

Ms. Tucker asserted several defenses to the EEOC that were not offered at the time of termination and have been debunked by the evidence developed during discovery: Ms. Tucker alleged to the EEOC that Ms. Jacobs had "outbursts" and that staff avoided addressing issues with her because of these "outbursts." J.A. 686. She specifically stated that Ms. Jacobs became angry with her trainer. *Id.* Ms. Tucker made no such allegation at the time of Ms. Jacobs' termination or in any documented discipline prior to termination.

Contrary to Ms. Tucker's statements to the EEOC, neither woman who trained Ms. Jacobs testified to any outbursts or expressions of anger. J.A. 261-262, 843. To the contrary, Ashley Stewart, who trained Ms. Jacobs, claims that Ms. Jacobs was friendly with other employees. J.A. 262. None of Defendants' witnesses could testify to any firsthand knowledge of any alleged "outbursts." J.A. 297-298, 441, 843. Defendants' witnesses indicated that Ashley English was the source of negative information about Ms. Jacobs' work and alleged conflicts. J.A. 857, 965-966. However, Ms. English remembered no such events and denied that she had reported such things to anyone. J.A. 841-842.

Given that these additional reasons were not raised before and are contradicted by other evidence, a jury could reasonably

43

infer that Defendants' asserted reasons were false and that falsity raises an inference of discrimination.

### 3.    Post-Charge Response and Litigation

After the EEOC issued a Cause Determination and Ms. Jacobs filed suit, Defendants asserted additional bases for firing Ms. Jacobs, all of which are contradicted by other evidence.

Defendants now allege that Ms. Jacobs was asleep on the job. J.A. 632, 1014. This allegation was not made at the time of termination or in the response to the EEOC. J.A. 684-688, 743, 684-688, 827. Defendants' witnesses have made contradictory statements as to the source of this allegation, and Ms. Jacobs has denied it. J.A. 388-389, 496-497, 604, 840, 934. Defendants' witnesses conceded that they had worked out details regarding this allegation together in advance of one of their depositions. See J.A. 968-969 ("I . . . asked her . . . if she could recall whether I saw Christina sleeping upstairs or downstairs").

Similarly, Defendants now allege that Ms. Jacobs failed to follow procedure in calling in sick. J.A. 960-961. This allegation was not made prior to discovery in this case. Defendants' own policies state that an employee should call a supervisor if the employee needs to take a sick day. J.A. 660-661. That is exactly what Ms. Jacobs did. J.A. 611, 882-883, 960-961.

44

Affidavits from Ms. Jacobs' former co-workers, submitted in conjunction with Defendants' Motion for Summary Judgment, contain additional allegations unrelated to any reasons previously stated for termination. J.A. 259, 261-262. These affidavits do not say that these new allegations were ever reported to anyone at the Clerk's office. J.A. 259, 261-262. In other words, not only are these allegations new, there is no effort to connect them to the decision to terminate; instead, they appear designed to smear Ms. Jacobs and bolster the Defendants' position generally. Notably, these affidavits were produced after the discovery period, when there was no opportunity to depose the affiants with regard to the questions raised by their affidavits.

In summary, Defendants adding on of additional rationales undermines the original stated reason for termination, and would support a jury finding of pretext. *EEOC v. Sears Roebuck, supra,* at 853-854.

Ms. Jacobs' termination has significant indicia of retaliation and discrimination, including strong temporal proximity and substantial evidence of pretext. Because there is ample evidence of retaliation and discrimination, Defendants' Motion for Summary Judgment should have been denied.

**VI. Defendants' Failure to Provide a Reasonable Accommodation Violated the ADA**

    A.   <u>Defendants Knew of Ms. Jacobs' Disability and Her Request for a Reasonable Accommodation</u>

"To request accommodation, an individual may use 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'" *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, Notice No. 915.002 (Oct. 17, 2002). *See also*, *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)("statute does not require the plaintiff to speak any magic words. . . . The employee need not mention the ADA.")

    *1. Defendants Were Aware of Ms. Jacobs' Disability*

Ms. Jacobs took all steps available to her to put Defendants on notice of her disability and to request accommodations, going beyond what is required by the statute. She disclosed her disability to Ms. Excell in May 2009. J.A. 202, 820, 851-852, 873-875, 893-894. Ms. Tucker was well aware of this disclosure and made a specific note of it for Ms. Jacobs' file. J.A. 823, 997. All three supervisors were informed in writing of the disability on September 8, 2009. J.A. 607. In addition, Ms. Tucker printed out and wrote on Ms. Jacobs' email requesting an accommodation, in which Ms. Jacobs specifically refers to her disability. J.A. 824. The trial court's conclusion that the Clerk was not on notice of Ms. Jacobs' disability and

request for accommodation does not take this evidence into account, but instead credits assertions by the Defendants that are contrary to evidence in the record. J.A. 824, 1003, 1038.

> 2.    *Defendants Were Aware of Ms. Jacobs' Request for Accommodation*

The subject line of Ms. Jacobs' email to her three supervisors on September 8, 2009 was "Front Counter Accommodation." J.A. 607. The email mentioned specifically her diagnosis of social anxiety disorder. *Id.* Ms. Jacobs asked to be trained in a different role and perhaps to work at the counter only once a week. *Id.* She closed by stating that "under the circumstances of my disability, I need to do whatever I can to accommodate so I can continue to contribute to the successfulness of the Clerk's Office." *Id.* Ms. Kennedy acknowledged the importance of the email by time-stamping it. J.A. 607, 951. Ms. Jacobs' three supervisors and Ms. Radewicz, Ms. Tucker's assistant, had the authority to re-assign Ms. Jacobs. J.A. 975-976, 987-988. However, without explanation, they chose not to take any action on Ms. Jacobs' request until Ms. Tucker's return. J.A. 948-950.

Ms. Jacobs forwarded the email to Ms. Tucker on September 9, 2009. J.A. 824, 895. Ms. Jacobs' accommodation request was on Ms. Tucker's desk when Ms. Jacobs was called into Ms. Tucker's office. J.A. 824, 912. Rather than act on Ms. Jacobs' request,

or engage in any discussion of possible alternatives, Ms. Tucker fired Ms. Jacobs.

As noted above, the denial that there was any discussion between the supervisors and Ms. Tucker of Ms. Jacobs' request prior to her termination flies in the face of reason and is contrary to the evidence. The supervisors, who all admitted to reading the request, met with Ms. Tucker before Ms. Jacobs was terminated. J.A. 854-855, 927, 948-949. During this meeting, when Ms. Jacobs asked if what was happening was related to the email, Ms. Tucker did not ask which email Ms. Jacobs was referring to because she already knew. Ms. Tucker's denial that the termination was related to the email was a tacit admission that she knew exactly to which email Ms. Jacobs was referring. J.A. 825-827.

It is undisputed that Ms. Jacobs' supervisors were aware of her request for accommodation and had the power to change her work assignment. There is substantial evidence that Ms. Tucker was fully aware of Ms. Jacobs' disability and her request for accommodation.

B.    Ms. Jacobs was Able to Perform the Essential Functions of a Deputy Clerk and Sought an Accommodation that Was Reasonable Under the Circumstances

"A job function may be considered essential for any of several reasons, including but not limited to the following: (i) The function may be essential because the reason the position

48

exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2). The question of whether a duty is an essential function of a job is a question of fact to be determined on a case-by-case basis. 29 C.F.R. § 1630 App. § 1630.2(n).

There were about 30 deputy clerks in the Criminal Division. J.A. 433, 674-676. All were trained to perform front counter tasks. J.A. 433-435. Two clerks at a time worked the front counter. *Id.* Deputy clerks performed varied tasks, including dispositions, cashier, intake, courtroom clerk, filing, orders for arrest, data entry, calendars and bookkeeping. *Id.* Many deputy clerks were never asked to work the front counter, even though they had been trained to do so and had done so in the past. J.A. 474, 940.

Evidence in the record demonstrates that working the front counter was not an essential function of a deputy clerk position, and that not all, or even most, deputy clerks were required to work at the front counter. The position did not exist solely to perform front counter work, there were a

sufficient number of other employees who could perform the front
counter work, and the work performed by front counter clerks was
not specialized. 29 C.F.R. § 1630.2(n)(2); *see also*, *Tate v.
Farmland Indus., Inc.,* 268 F.3d 989, 993 (10th Cir. 2001) ("The
question of whether a job requirement is a necessary requisite
to employment initially focuses on whether an employer actually
requires all employees in the particular position to satisfy the
alleged job-related requirement.")

Ms. Jacobs' request was reasonable both because working the
front counter was not an essential function and because Ms.
Jacobs did not request that she not be required to work at the
front counter <u>at all</u>; rather, she indicated that she wanted to
reduce her time at the front counter and learn to do some of the
other tasks performed by deputy clerks. J.A. 798.

Even if the Defendants could show that working at the front
counter was an essential function of working as a deputy clerk
and that moving Ms. Jacobs to dispositions or other data entry
positions was impracticable, Ms. Jacobs' anxiety disorder in
interacting with the public at the front counter did not prevent
her from doing the essential functions of a deputy clerk
position. *See supra*, Section III.B., pp. 31-33. Ms. Jacobs
currently works in a front counter position. J.A. 901. She is
successful in that position and has decreased anxiety that she
credits to her training and supportive co-workers. J.A. 821,

50

822. Dr. Coleman, Plaintiff's expert, opined that had Ms. Jacobs had similar training and support at the Clerk's Office, she would have performed without debilitating anxiety. J.A. 800-801.

Ms. Jacobs' request was intended to start a discussion with her employer regarding how she could continue to contribute to the Clerk's office in the face of her disability. J.A. 798. Defendants failed to engage in the interactive process that is required when an employee makes such a request for an accommodation. *See U.S. Airways v. Barnett*, 535 U.S. 391, 407 (2002)(Stevens, concurring)("The Court of Appeals also correctly held that there was a triable issue of fact precluding entry of summary judgment with respect to whether [the employer] violated the statute by failing to engage in an interactive process concerning [the employee]'s three proposed accommodations"); *see also*, *EEOC v. Fed Express Corp.*, 513 F.3d 360, 375-376 (4th Cir. 2008)(holding that failure to engage in interactive process supported finding of bad faith) and *Haneke v. Mid-Atlantic Capital Mgmt*, 131 Fed. Appx' 399, 400, 2005 U.S. App. LEXIS 8186, *3 (4th Cir. 2005)(*per curiam*)("Implicit in the fourth element [that the covered entity refused to make a reasonable accommodation] is the ADA requirement that the [parties] engage in an interactive process to identify a reasonable accommodation").

Ms. Jacobs' request for an accommodation was met with avoidance by three supervisors who were all made aware of Ms. Jacobs' disability and request in an email that they acknowledge receiving. All three supervisors were capable of modifying Ms. Jacobs' work assignments to provide an accommodation. J.A. 875-976, 987-988. Instead, Ms. Jacobs was told that she needed to wait approximately three weeks for Ms. Tucker to return. No temporary solutions were implemented or even proposed. Ms. Jacobs was not asked for more information, but simply told to wait. When Ms. Jacobs attempted to use some of her accrued leave time to get through the waiting period of when her accommodation would be addressed, she was questioned about why she wanted leave and then the requests were denied. J.A. 326-327, 821. Previous leave requests were not met with questioning and had always been approved. J.A. 821.

Under the circumstances, Defendants' failure to engage in the interactive process or provide a reasonable accommodation violated the ADA.

### CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully contends that the District Court erred in granting summary judgment on Plaintiff's claims for retaliation, disability discrimination, and failure to accommodate, and respectfully requests that the Fourth Circuit reverse the judgment of the

District Court and remand this case to the District Court for trial.

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 34(a), Plaintiff-Appellant hereby requests oral argument in this matter.

Oral argument is appropriate in this case because, as far as counsel can determine, there are no Fourth Circuit cases relating to the determination of disability under the 2008 Amendments to the Americans With Disabilities Act, which is a significant and developing area of law.

The issues in this case are significant to the parties, other workers with disabilities, as well as employers.

/s/  Vanessa K. Lucas
Vanessa K. Lucas
EDELSTEIN & PAYNE
Post Office Box 28186
Raleigh, NC  27611
(919) 828-1456

Lisa Grafstein
Mercedes Restucha-Klem
DISABILITY RIGHTS
  NORTH CAROLINA
2626 Glenwood Avenue
Suite 550
Raleigh, NC  27608
(919) 856-2195

*Counsel for Appellant*

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed.
    R. App. P. 32(a)(7)(B) because:

         this brief contains 11,545 words, excluding the parts
         of the brief exempted by Fed. R. App. P.
         32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.
    R. App. P. 32(a)(5) and the type style requirements of Fed.
    R. App. P. 32(a)(6) because:

         this brief has been prepared in a mono-spaced typeface
         using Microsoft Word in 12 point Courier New.


                              /s/  Vanessa K. Lucas
                              Vanessa K. Lucas

                              *Counsel for Appellant*


Dated:  November 26, 2013

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on November 26, 2013, I

electronically filed the foregoing with the Clerk of Court using

the CM/ECF System, which will send notice of such filing to the

following registered CM/ECF users:

> Kathryn Hicks Shields
> Grady L. Balentine, Jr.
> NORTH CAROLINA
>     DEPARTMENT OF JUSTICE
> 114 West Edenton Street
> P. O. Box 629
> Raleigh, NC 27602
> (919) 716-6879
>
> *Counsel for Appellees*

The necessary filing and service were performed in

accordance with the instructions given to me by counsel in this

case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219
